

Signed/Docketed
July 21, 2011

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-27284-MER |
| 1ST FINANCIAL SERVICES, LLC ) | |
| ) | Chapter 11 |
| Debtor. ) | |

## ORDER

THIS MATTER comes before the Court on a contested, evidentiary plan confirmation hearing on July 7, 2011.  The Court has considered the Debtor's proposed *Amended Plan [March 21, 2011]*, the *Objection to Confirmation of Debtor's Plan* filed by Tanya Dyjak, the exhibits admitted at the hearing and the testimony of Jeffry C. Eisnaugle and Tanya Dyjak,[1] and hereby rules as follows:

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) as it concerns confirmation of the Debtor's Plan.

## BACKGROUND

The Debtor is a Colorado limited liability company engaged in providing investment advice to individual private investors, which has been wholly owned and managed since September 2003 by Jeffry C. Eisnaugle ("Eisnaugle"), a certified financial planner, a certified fund specialist, and a chartered mutual fund counselor."[2]  The Debtor's business began to decline in late 2008 and 2009.  During 2009 through early 2010, Eisnaugle, both personally and on behalf of the Debtor, guaranteed minimum account levels for numerous clients.  Eisnaugle and the Debtor were unable to honor those guarantees and Eisnaugle decided to sell 1st Financial.  With the assistance of a business broker, but without the assistance of legal counsel, on June 30, 2010 (pre-petition), the Debtor sold substantially all of its assets and business to PVG Asset Management, Inc. ("PVG"), pursuant to an Asset Purchase Agreement (the "APA").[3]

---

[1] See the *Amended Plan [March 21, 2011]* (the "Plan") filed by the Debtor on March 21, 2011 (Docket #53) and the *Objection to Confirmation of Debtor's Plan* (the "Objection") filed by Tanya Dyjak ("Dyjak") on June 30, 2011 (Docket #121).

[2] *Amended Disclosure Statement [May 25, 2011]* (the "Disclosure Statement") filed by the Debtor on May 25, 2011 (Docket #91), p. 6.

[3] Asset Purchase Agreement and Promissory Notes (Debtor Exhibit 1).

1. **The Chapter 11 Plan**

The Chapter 11 petition was filed on July 12, 2010, shortly after the sale to PVG. The Plan in this case is fairly simple. The Debtor will pay allowed claims from the proceeds of the sale to PVG (comprised of existing cash and future note payments) over the course of 4 years. Objections to the Plan were filed by the United States Trustee and three disputed creditors: (1) Tanya Dyjak, (2) Ann Crowell, and (3) Greg M. Marthaler. The United States Trustee objected because the Debtor was delinquent in the filing of Monthly Operating Reports ("MORs") and had not paid the Chapter 11 quarterly fees for the first quarter of 2011, totaling $978.29. Those deficiencies were cured by the confirmation hearing date and the UST withdrew his objection. Creditors Crowell and Marthaler filed objections asserting Eisnaugle was using the Debtor's assets to obtain relief from personal liability, that Eisnaugle is not the appropriate person to carry out the terms of the Plan, and that the Plan has not been proposed in good faith. Crowell and Marthaler settled their disputes with the Debtor at the Plan confirmation hearing and withdrew their objections. The only remaining objection is that of Dyjak.

2. **The Dispute Between Eisnaugle and Dyjak**

Eisnaugle is the father of Dyjak's two children. She was employed at the bank where Eisnaugle and the Debtor maintained accounts. She also invested personal funds with 1st Financial. On January 27, 2011, Dyjak filed proof of claim no. 42-1 asserting an unsecured claim of $94,248.57. On the proof of claim form, the basis for such claim is described as "Mismanagement/Misrepresentation re: investment, reverse piercing." Dyjak did **not** check the box indicating the claim was for a domestic support obligation. However, the attachment to the proof of claim breaks down the claim as follows:

    A. Damages for mismanagement:
        Traditional IRA        $58,591.58
        Roth IRA              $14,767.08
    B. Damages for misrepresentation:
        Investment           $7,718.91
    C. Reverse piercing
        Child support        $11,500.00
        Schooling           $2,010.00

On June 2, 2011, the Debtor filed its *Objection to Claim Number 42 Of Creditor Tanya Dyjak* (the "Claim Objection). The Claim Objection states in relevant part: "The Debtor hereby objects to the Claim on the grounds that (1) the Debtor owes no amount to the Claimant under any theory of recovery; (2) the Claim has been settled and released in whole or part; and (3) the Claim is barred under 11 U.S.C. § 502(d)."[4]

On June 30, 2011, Dyjak filed an amended proof of claim (no. 42-2) asserting an unsecured claim of $85.865.20. On the proof of claim form, the basis for such claim is again described as

---

[4] *Objection to Claim Number 42 Of Creditor Tanya Dyjak* (Docket #102), p.1.

"Mismanagement/Misrepresentation re: investment, reverse piercing." As on the original proof of claim, Dyjak did not check the box indicating the claim was for a domestic support obligation. The attachment to the amended proof of claim breaks down the claim as follows:

    A. Damages for mismanagement:
        Traditional IRA        $62,214.23
        Roth IRA              $15,432.06
    B. Damages for misrepresentation:
        Investment           $7,718.91
    C. Reverse piercing
        Schooling            $500.00

The amended proof of claim also includes, as attachments, certain statements from 1st Financial, a July 27, 2009 "Stipulation of Financial Responsibilities and Parenting Plan" between Eisnaugle and Dyjak, and a July 9, 2010 "Release and Settlement Agreement" between 1st Financial and Dyjak.

Also on June 30, 2011, Dyjak filed an *Objection and Request for Hearing* in response to the Debtor's Claim Objection, stating in full,

> (1) Ms. Dyjak timely filed her claim, has amended her claim based on new orders and her claim is appropriate due to the alter-ego status of the Debtor and Mr. Eisnaugle due to the applicability of reverse piercing. (2) The Debtor's objection to Ms. Dyjak's claim is merely a strategic device to gain tactical advantage by eliminating Ms. Dyjak's ability to vote on the approval of the plan.[5]

The Debtor's objection to Dyjak's claim has not been set for a hearing. At the confirmation hearing on July 7, 2011, pursuant to FED. R. BANKR. P. 3018(a), the Court allowed Dyjak's claim (as well as the disputed claims of Crowell and Marthaler) for the limited purpose of voting and plan confirmation.

Finally, Dyjak also filed her objection to plan confirmation (the "Plan Objection"), which can summarized as follows:

- Dyjak alleges the Debtor and Eisnaugle are alter egos, evidenced by Eisnaugle being the 100% member and owner of the Debtor, Eisnaugle's personal guarantees of certain 1st Financial debts, Eisnaugle being the "Payee" of the PVG notes, and allegations Eisnaugle's personal debts are listed in the Debtor's balance sheet and he has previously utilized the Debtor to pay his child support obligations. Along with this argument, Dyjak contends, under a "reverse piercing" argument, the Debtor is obligated to fulfill Eisnaugle's domestic

---

[5] *Objection and Request for Hearing* (Docket #115), p.1.

  support obligation which has become payable after the date of the filing of the petition and thus, confirmation must be denied under 11 U.S.C. § 1129(a)(14).[6]

- Dyjak alleges the Debtor is favoring those creditors with whom Eisnaugle has a personal or continuing relationship (by not objecting to their claims) and disputing the claims of those without a personal connection to, or guarantee from, Eisnaugle.

- Dyjak criticizes the Debtor for filing its MORs late, and points out the MORs reflect the payments from PVG have also been late and lower than originally anticipated. Dyjak argues there appears to be no effort to enforce timely payment from PVG and points out there are no penalties for late payments or non-payments. Dyjak suggests this shows the payment plan is very uncertain if not completely unfeasible.

- Dyjak requests the Court deny confirmation and either dismiss the case or convert it to Chapter 7.

## DISCUSSION

**1. Dyjak's Objection Regarding Disparate Treatment of Creditors**

  This objection appears to contend the Debtor lacks the good faith required by § 1129(a)(3), as well as to assert the plan is unconfirmable under § 1129(b)(1), which requires that a "plan does not discriminate unfairly, and is fair and equitable."[7] Indeed, Dyjak argues the Plan unfairly discriminates against certain creditors who did not obtain guarantees from the Debtor or Eisnaugle, or who do not have personal relationships with Eisnaugle.

  The Plan includes (A) Unclassified Claims, such as professional fees for Debtor's counsel and accountant, and for tax claims and fees owed to the U.S. Trustee and (B) Classified Claims, including:

- Class 1 of "unsecured general non-priority claims of $1,000 or less," (approximately 8 claims of which 2 are disputed), and

- Class 2 of "unsecured non-priority claims of more than $1,000." (Approximately 53 claims of which 13 claims are disputed).

The Debtor's evaluation of these claims led it to conclude:

> Generally, Claims based on tort theories are disputed, and those based in contractual obligations are admitted. Further, Claims may be disputed due to a failure to attach sufficient documentation to support the Claim or a failure to attribute offsetting

---

[6] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[7] Section 1129(a) and (b).

payments to such Claims. The Debtor rejects the assertion by certain Claim holders that all asserted creditors should be treated alike, regardless of whether they hold a written guaranty of payment, as such assertion is without sufficient legal foundation.[8]

The Debtor's *Report of Balloting* shows the overwhelming majority of creditors accepted the Plan.[9] The voting requirements of § 1126(c) have been met in this case as all holders of Allowed Claims in Class 1 voted to accept the Plan and Class 2 also voted to accept the Plan. Even with the Court's allowance of the disputed claims of Crowell, Dyjak and Marthaler for voting and plan confirmation purposes, the provision in § 1126(c) requiring two-thirds in dollar amount and more than one-half in number is met, and Class 2 would be deemed to have accepted the Plan. Thus, § 1129(a)(8) is met as each class has accepted the Plan.

In addition, the Court's review of the docket shows the Debtor has filed nine objections to claims, including the claim of Dyjak. There simply was no clear evidence or showing that the Debtor favored certain creditors over others or that the nine claim objections on file were in bad faith. Accordingly, Dyjak's objection based on this ground is overruled.

**2.     Dyjak's Objection Regarding Feasibility under § 1129(a)(11) or "Best Interest of Creditors" Test under § 1129(a)(7) Due to Lower Quarterly Payments than Anticipated**

The Disclosure Statement provides the following explanation of the sale and APA:

The terms of the sale were an initial down payment of $300,000.00, paid at closing on June 30, 2010, together with two promissory notes. A first promissory note in the principal amount of $100,000.00, bearing no interest, was paid in August 2010. The second promissory note in the principal amount of $1,245,000.00, bearing interest at six percent, is due and payable in 13 quarterly installments of $106,647.60, beginning in October, 2010. The full maximum purchase price for the sale of the Debtor's assets is $1,786,419, given interest accumulation.[10]

The "Adjustable, Secured Promissory Note" for $1,245,000 defines PVG as the "Maker" and Jeff C. Eisnaugle (not 1st Financial) as the "Holder." None of the proceeds from the PVG sale have been paid directly to Eisnaugle. Rather, an account was established at Steele Street Bank & Trust in the name of "1st Financial Services, LLC, Debtor-in-Possession, c/o Rothgerber Johnson & Lyons, LLP" (the "Steele Street Account"). Although Eisnaugle admitted he was personally identified as the "Holder" of the Notes, he understood the proceeds from the PVG sale were to be held in trust for the benefit of 1st Financial's creditors. To a certain extent, Eisnaugle blamed his lack of counsel for this apparent error in the Note documentation.

---

[8] Disclosure Statement, p. 13.

[9] *Report of Balloting* filed July 4, 2011 (Docket #133).

[10] Disclosure Statement, p. 7.

The second promissory note called for quarterly payments starting in October 2010, which leads the Court to believe payments should have been made in October 2010, January 2011, April 2011, and July 2011, and so forth for 13 quarterly payments. According to the Debtor's MORs filed with the Court, the Debtor has received the following amounts from PVG:

- The MOR for December 2010, filed on February 28, 2011, shows a PVG payment described as "Pre-Petition Sales Proceeds" in the amount of $98,000.00 (the Steele Street Account statement attached to the December MOR shows a "Wire correct from 12/17/10," posted on 12/20/11, for $98,000.00).[11]

- The MOR for February 2011, filed on April 2, 2011, shows a PVG payment described as "Sale Proceeds" in the amount of $96,000.000.[12]

- The MOR for May 2011, filed on July 5, 2011, shows a PVG payment described as "Note Payment" in the amount of $43,145.39 (the Steele Street Account statement attached to the May MOR shows a "Wire from Rothgerber Johnson & Lyons" on May 24, 2011, for $43,145.39).[13]

Although the Debtor's Disclosure Statement anticipated the quarterly payments would be $106,647.60, Eisnaugle explained the most recent quarterly payment of $43,145.39 was substantially lower because of the "adjustable terms" in the APA and Note related to the performance of the investment accounts. Although it is possible the payment could go up or down, Eisnaugle testified he believed the quarterly payments were essentially now fixed at $43,145.39 (with the exception of certain circumstances that could adjust the figure). Consistent with Eisnaugle's testimony, the Disclosure Statement cautions:

> The second promissory note may have two adjustments, at nine months and again at 18 months from the date of sale. If total revenues, not number of clients, falls by more than ten percent, then there will be a corresponding drop in the purchase price by an equal percentage. Overall growth or loss in performance has an impact upon this type of an adjustable note.[14]

Section 1129(a)(11) requires the Court to make a finding that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is

---

[11] Monthly Operating Report for period ending December 31, 2010 (Dyjak Exhibit F-1) (Docket #51).

[12] Monthly Operating Report for period ending February 28, 2011 (Dyjak Exhibit F-2) (Docket #63).

[13] Monthly Operating Report for period ending May 31, 2011 (Docket #136).

[14] Disclosure Statement, p. 7.

proposed in the plan."[15] This Plan is a liquidating plan - based on the proceeds from the sale of the Debtor. The Debtor is not attempting to reorganize its business (the business has shut down), and all that remains is to collect on the Notes under the APA and to resolve disputed claims (either through FINRA, AAA, claims objections or adversary proceedings). Therefore, the Court finds the Note payments fall within the parameters contained in the APA, and they are what they are. This is true whether this case is a Chapter 11 or a Chapter 7, or outside of bankruptcy. No reorganization is contemplated and there is no other method or reason for further liquidation.

Further, there was no evidence showing the Debtor's "best interest of creditors" analysis, included in the Disclosure Statement at pages 22-24, was inaccurate or that the test has not been met. The only real difference in a Chapter 7 and a Chapter 11 is the Chapter 7 Trustee's commission and litigation expenses versus the Chapter 11 administrative fees. Eisnaugle testified he is not being compensated for the approximate 5 hours per week he devotes to this case and will not seek compensation for his continuing work under the Plan terms. Thus, Dyjak's objections based on lower quarterly payments than anticipated, under either
§ 1129(a)(11) feasibility or § 1129(a)(7) "best interest of creditors" test, are overruled.

**3. Objection Based on Lack of Good Faith and/or Feasibility for the Debtor's Failure to Asserts Rights under "Acceleration/default" Provision**

Similarly, Dyjak criticizes the Debtor and Eisnaugle for failing to assert rights under the "acceleration/default" provision in the Note and APA. She suggested Eisnaugle's personal relationship with people at PVG prevented Eisnaugle from declaring a default and calling the entire Note due. Dyjak suggests this shows a lack of good faith under § 1129(a)(3).

The Disclosure Statement acknowledges, "PVG is in business and has not defaulted on its obligations. PVG has been tardy in making note payments; however, the Debtor has asserted no penalty against PVG for such late payments."[16] Eisnaugle testified he was very upset at the late payment and the reduced payment amount. However, Eisnaugle understood or accepted the delay in making the payment because he knew the calculation required to ascertain the amount of the payment would take some time with some 400 accounts to consider. He suggested, in hindsight, the terms should have provided PVG additional time to make such calculations. Further, Eisnaugle believed it was better for the Debtor to accept a late payment than to declare a default and commence litigation or create an adverse relationship with PVG. Eisnaugle believes the PVG sale is the best chance of repaying the Debtor's creditors.

The Court cannot find a lack of good faith in the Debtor's or Eisnaugle's failure to declare a default. There was no evidence that PVG could have, or would have, paid the entire sum due and owing when the alleged default occurred. As Eisnaugle speculated, such a demand could have very well placed PVG itself into bankruptcy. Moreover, PVG did eventually make the quarterly payment, albeit late. For these reasons, Dyjak's objection based on the Debtor's failure to assert rights under the acceleration and default provision is overruled.

---

[15] Section 1129(a)(11).

[16] Disclosure Statement, p. 7.

**4.     Objection Based on § 1129(a)(14) and Eisnaugle's Domestic Support Obligation**

Section 1129(a)(14) provides,

> If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.[17]

In this case, the Debtor is a limited liability company. Eisnaugle individually is not a debtor. Dyjak argues, however, the facts in this case allow the Court to enforce a "reverse piercing" claim, holding 1st Financial liable to pay any domestic support obligation of Eisnaugle. Dyjak's argument is based on the concept of "reverse piercing" as set forth in *In re Phillips*.[18] In *Phillips*, the Colorado Supreme Court discussed reverse piercing and the difference between "inside" and "outside" reverse piercing (with outside reverse piercing being relevant to this proceeding). The Colorado Supreme Court set forth the following facts a court should consider before allowing outside reverse piercing:

> A court may reverse pierce the corporate veil and obtain the assets of a corporation for the obligations of a controlling shareholder or other corporate insider only upon a clear showing that (1) the controlling insider and the corporation are alter egos of each other, (2) justice requires recognizing the substance of the relationship over the form because the corporate fiction is utilized to perpetuate a fraud or defeat a rightful claim, and (3) an equitable result is achieved by piercing. Only when a claimant makes a clear showing of each factor may the corporate form be disregarded.
>
> Generally, in determining whether to outside reverse pierce the corporate veil, a court should review the same factors utilized in determining whether traditional veil piercing is appropriate.[19]

As noted in *Phillips*, courts consider the following factors in "traditional" veil piercing:

> In establishing whether such unity of interest exists as to disregard the corporate fiction and treat the corporation and shareholder as alter egos, courts consider a variety of factors, including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere

---

[17] Section 1129(a)(14).

[18] *In re Phillips*, 139 P.3d 639 (Colo. 2006).

[19] *In re Phillips*, 139 P.3d at 646 (citations omitted).

shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes.[20]

The evidence presented in this case falls short of establishing a reverse piercing or alter ego claim. The Court bases this conclusion on the following evidence:

First, the Notes from the sale to PVG show Eisnaugle (not 1st Financial) as the "Holder."[21] This suggests piercing of the corporate veil may be appropriate in this case. However, as explained by Eisnaugle, the Notes were drafted without the assistance of counsel, were based off template notes, and all funds have been held in trust for the benefit of 1st Financial's creditors. The fact that Eisnaugle is listed as the "holder" weighs in favor of piercing, but the actual treatment of the funds and intentions of the parties weighs against such a finding.

Second, Eisnaugle made personal guarantees to certain clients of 1st Financial. The Debtor's Original Schedule F shows Eisnaugle as a co-debtor for approximately 23 of the 52 debts listed.[22] Eisnaugle testified he was personally obligated on about 1/3 of 1st Financial's debts and that he has his own separate debts as well, including debts owed to the IRS. These facts weigh against piercing because the debts of Eisnaugle and the Debtor are not identical.

Third, Eisnaugle testified he kept separate bank accounts for himself and for 1st Financial. On this point, the testimony regarding 1st Financial's and Eisnaugle's relationship with Paul Olsen was somewhat confusing. Schedule F lists Mr. Olsen with a "note" claim of $828,000 and a "business guaranty" claim of $93,346.39.[23] Dyjak introduced a "Promissory Note" for $1,650,000, dated September 15, 2003, between Eisnaugle (as "Borrower") and Paul Olsen (as "Lender").[24] Eisnaugle testified he bought the business from Olsen in 2003 and the September 2003 note evidences that buy/sell agreement. Although this note is not in the name of 1st Financial, Eisnaugle testified the Olsen note had always been carried on the books of 1st Financial and was not intended to be a personal loan.[25] According to Eisnaugle, he did not have an attorney when the September 2003 note was prepared, but the parties understood it was an obligation of 1st Financial. Eisnaugle explained Paul Olsen later lent in excess of $800,00 to 1st Financial but had agreed to reduce the amount he is owed on his note, and that he has not been repaid for this note.

---

[20] *In re Phillips*, 139 P.3d at 644 (citations omitted).

[21] Asset Purchase Agreement and Promissory Notes (Debtor Exhibit 1).

[22] Schedule F (Dyajk Exhibit A) (Docket #1). The Court notes Schedule F was amended on December 24, 2010 (Docket #45).

[23] Schedule F (Dyajk Exhibit A) (Docket #1).

[24] Promissory Note for $1,650,000 dated September 15, 2003 (Dyjak Exhibit C-1).

[25] *See* 1st Financial Service, LLC Balance Sheet as of June 30, 2010 (Dyjak Exhibit C-2).

In contradiction, Dyjak introduced checks from Eisnaugle's personal checking account showing Eisnaugle had paid Paul Olsen 4 checks totaling $31,671.[26] Eisnaugle, however, asserted Paul Olsen had loaned money to both 1st Financial (as evidenced by the note in Exhibit C-1) and separately to Eisnaugle personally (as evidenced by the checks in Exhibit I). Eisnaugle testified the checks written by him personally to Paul Olsen were for the personal loans (Exhibit I). Despite the confusion with Paul Olsen, the Court believes Eisnaugle's testimony that he kept separate bank accounts for himself and for 1st Financial, and this fact weighs against piercing.

Fourth, on July 9, 2010, Eisnaugle (acting as Manager of 1st Financial) and Tanya Dyjak entered into a "Release and Settlement Agreement" in connection with Dyjak and Eisnaugle's Denver District Court Case No. 2009 DR 2856 (the "July 9 Agreement").[27] Dyjak contends the July 9 Agreement was in satisfaction of the child support dispute, while Eisnaugle contends the Agreement was to settle any tort claims Dyjak had against 1st Financial. The July 9 Agreement cuts both ways, part in favor of Dyjak's argument and part in favor of Eisnaugle's argument/interpretation. The July 9 Agreement states in relevant part:

> ¶ 3.a. Contemporaneous with the execution of this Agreement, 1st Financial will pay to Petitioner [Dyjak] in good funds U.S. $29,750.00, without recourse, to the order of Petitioner's attorneys, Senn Visciano Canges Rosenstein, P.C. (herein "Payment").
>
> ¶ 3.b. Petitioner acknowledges that her acceptance of the Payment serves as a full and complete satisfaction of the alleged financial obligation referenced in paragraph 1 above . . .[28]

This portion of paragraph 3.b. of the July 9 Agreement suggests Dyjak is correct that the Agreement resolved the child support dispute and made 1st Financial liable for Eisnaugle's personal obligation. This is so because paragraph 1 of the July 9 Agreement states,

> [Eisnaugle] is a member and manager of 1st Financial. Eisnaugle allegedly owes a financial obligation to Petitioner due to unpaid child support, the amount of which is disputed. Petitioner believes that the amount owed is $63,719.62; Eisnaugle believes the amount owed is $14,000.[29]

However, paragraph 3.b. goes on to state (in addition to satisfaction of the alleged financial obligation of ¶ 1):

---

[26] *See* checks (Dyjak Exhibit I).

[27] Release and Settlement Agreement dated July 9, 2010 (Dyjak Exhibit D, pp. 3-4).

[28] July 9 Agreement, ¶¶ 3a. and 3.b (Dyjak Exhibit D, pp. 3-4).

[29] July 9 Agreement, ¶ 1 (Dyjak Exhibit D, pp. 3-4).

> . . . **and** Petitioner releases and waives all financial claims against 1st Financial and Eisnaugle, both in his capacity as member and manager of 1st Financial and individually, arising from the Case through and including June 30, 2010.[30]

The Court views the July 9 Agreement as potentially settling both the dispute about Eisnaugle's child support and any tort claims against 1st Financial. Therefore, the July 9 Agreement tends to support Dyjak's piercing claim. However, the July 9 Agreement does not specifically state 1st Financial is obligated to all of Eisnaugle's personal child support debts, and so is not conclusive. It is merely one factor to be considered.

It should also be noted that creditors were provided a disclosure concerning this dispute and chose to overwhelmingly accept the Plan. Specifically, the Disclosure Statement acknowledges this disagreement, stating, "Ms. Dyjak objects to the Debtor's characterization of the payment as being in satisfaction of a 'tort' claim and asserts that the noted payment was in satisfaction of personal domestic support obligations."[31]

Fifth, on June 23, 2011, *nunc pro tunc* to June 1, 2011, the Honorable Magistrate Elizabeth Leith entered an *Order From June 1, 1011 Hearing* ruling on Eisnaugle's *Motion to Modify Child Support* and Dyjak's *Motion for Contempt Citation* (the "June 1 Order").[32] In the June 1 Order, Judge Leith specifically found: "This Court does not believe that Mr. Eisnaugle used the funds from the sale of 1st Financial to pay personal amounts."[33] Thus, under the Full Faith & Credit Clause[34] and the *Rooker-Feldman* doctrine,[35] at least with respect to actions after the June 30, 2010 sale to PVG, this Court accepts Judge Leith's finding that there has been no co-mingling of funds between the Debtor and Eisnaugle. The June 1 Order goes on to grant Eisnaugle's Motion to Modify, to dismiss the Contempt Citation dated November 24, 2010, and to decline to enter Dyjak's second requested contempt citation. The June 1 Order directs Eisnaugle (not 1st Financial) to pay certain amounts for child support. The June 1 Order does not obligate 1st Financial to make any payments to Dyjak.

Sixth, the reverse piercing argument appears to be relevant only to $500 for "schooling," out of Dyjak's $85.865.20 Amended Proof of Claim.

---

[30] July 9 Agreement, ¶ 3.b (Dyjak Exhibit D, pp. 3-4).

[31] Disclosure Statement, p. 9.

[32] *Order From June 1, 2011 Hearing* (Dyjak Exhibit H).

[33] June 1 Order, ¶ 4 (Dyjak Exhibit H).

[34] *See* 28 U.S.C. § 1738, which codifies the Full Faith and Credit Clause of the Constitution, Art. IV, § 1.

[35] "Under the *Rooker-Feldman* doctrine, the federal courts lack subject matter jurisdiction to hear appeals from final judgments of state courts or to adjudicate claims that are inextricably intertwined with those judgments. *See Rooker v. Fid. Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *D.C. Ct.App. v. Feldman*, 460 U.S. 462, 486-87, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)." *Ebel v. Ebel (In re Ebel)*, 139 Fed. Appx. 26, 28-29 (10th Cir. 2005) (not published in F.3d); *see also Bolden v. City of Topeka, Kansas*, 441 F.3d 1129, 1139 (10th Cir. 2006).

Overall, the Court finds Dyjak has failed to establish an alter-ego relationship or that the requirements for reverse piercing have been met. The Court finds Eisnaugle has not used 1st Financial "to perpetuate a fraud or defeat a rightful claim" and an "equitable result" may be achieved without reverse piercing.[36] Thus, Dyjak's objection based on § 1129(a)(14) is overruled.

**5.     Objection Based on Lack of Good Faith as Evidenced by Inaccuracies in the Statements, Schedules and Other Pleadings**

As stated above, § 1129(a)(3) requires the Plan to be "proposed in good faith and not by any means forbidden by law." Dyjak pointed out several errors or inaccuracies in the Debtor's schedules, and inconsistencies between the Debtor's balance sheet and schedules. There was somewhat confusing testimony from Eisnaugle concerning the 1st Financial Balance Sheet as of June 30, 2010, and the "Loans Payable" to K. Lombardi, M. Connelly and Paul Olsen.

Eisnaugle admitted the debt to K. Lombardi (which appears on the balance sheet) was inadvertently left off Schedule F. This error should be corrected by the Debtor. The Court has already addressed the confusion with Paul Olsen. Eisnaugle acknowledged errors existed and attempted to explain any confusion. The Court does not believe these errors or inconsistencies demonstrate that the Plan was not proposed in good faith.

Dyjak also faulted the Debtor for failing to file timely MORs, essentially adopting the UST's objection. The UST had objected to the Debtor's Plan because the Debtor was delinquent in the filing of the reports and had not paid the Chapter 11 quarterly fees for the first quarter of 2011, totaling $978.29. On June 10, 2011, the Debtor filed MORs for March and April 2011. The May 2011 report was filed on July 5, 2011. At the start of the hearing on July 7, 2011, the UST advised the Court he was withdrawing the objection as all fees and reports were now current. Counsel for the Debtor further explained there was a delay in filing the MORs because the PVG sale proceeds went into the Steele Street Account with the Rothgerber law firm and not directly into the DIP account.

While the Court cannot stress enough the importance of accurate and timely schedules, statements and MORs, the Court does not believe the Debtor or Eisnaugle acted in bad faith in this regard. Dyjak's objections and arguments at the hearing were above the level of "nit picking" and properly raised. However, they fell short of establishing the Plan was not "proposed in good faith." Thus, Dyjak's objection based on inaccuracies in the schedules or late-filed MORs is overruled.

**6.     Personal Releases of Eisnaugle**

Although the Plan and Disclosure Statement do not specifically provide for a release of Eisnaugle's personal liability on any of the Debtor's debts, certain settlement agreements pending before this Court do. As reassurance that Eisnaugle is not attempting to use the Debtor or the Chapter 11 process for any personal gain, Eisnaugle and Debtor's counsel stated the Debtor would

---

[36] *In re Phillips*, 139 P.3d at 646 (citations omitted).

remove any personal releases of Eisnaugle from any pending or future settlement agreements before this Court. Based on the evidence at trial, the Court believes this is appropriate and will condition confirmation upon the removal of such personal releases. The Debtor shall file amended agreements as necessary to comply with this ruling.

## CONCLUSION

Based on the findings set forth in this Oral Ruling, the Court overrules Dyjak's objection and is satisfied that, through the Plan, Disclosure Statement, the *Report of Balloting*, and Eisnaugle's testimony, all of the requirements of § 1129 have been met and the *Amended Plan [March 21, 2011]* may be confirmed. Accordingly,

**IT IS ORDERED** the *Amended Plan [March 21, 2011]* is **CONFIRMED**. Debtor's counsel shall submit a separate proposed written confirmation order and email such order to courtroomd@cob.uscourts.gov.

Dated: July 21, 2011

BY THE COURT:

_____
Michael E. Romero
U.S. Bankruptcy Judge